I please the Court, Philip Robinson, on behalf of George and Jerry Calcutt. And with the leave of the Court, I'd like to reserve two minutes for rebuttal. Thank you very much for having me here today. I'm representing the Calcutts. Mr. Calcutt, because of his service on our behalf in the armed services, was entitled to certain benefits. And the chief benefit that's at issue in this case is their former VA mortgage loan. He, like a lot of other homeowners around the country at the beginning of the pandemic, found that they were eligible for and were granted a forbearance because of a reduction of household income and an increase in expenses. Congress passed the CARES Act that entitled Mr. and Mrs. Calcutt and thousands of other Americans with federally related mortgages, theirs is a VA mortgage, is a federally related mortgage, to a forbearance. And a forbearance in this context is they do not have to make payments for a period of time. And they were eligible for an extension on that forbearance. They had at the time a servicer, the defendant, an appellee, PRMG. PRMG hired a subcontractor, a vendor, a subservicer. You'll see those terms interchangeably in the papers. And from your own experiences, it's principal versus an agent. So they hired CENLAR, FSB, Federal Savings Bank, regulated by the Office of Comptroller and Currency, to perform most of the work. What's a little odd in this arrangement is that CENLAR performed all of the work using PRMG's name. So for the purposes of we know now, because you have a full record in front of you for discovery, the Calcutts did not know when they were communicating that they were actually talking to CENLAR. So I just, there's a little bit of a confusion there. We have two core issues that are sort of presented on appeal. I'm going to focus on the argument today on the RESPA claim. And that's under 12 U.S.C. 2605. Mr. and Mrs. Calcutt presented various claims under 2605 K1. That provision starts out, a servicer of a federally related mortgage loan shall not. And it continues on. This is a new provision. This provision did not exist in RESPA when it was originally enacted, I believe, in 1990. It was added as part of the Dodd-Frank legislation after the Great Recession in 2010. That as your honors knows, Dodd-Frank was enacted for the purposes of protecting and preventing financial abuses. We knew. Well, hold on. What they added was that, you know, what they didn't want is folks not to, you know, to ignore these requests, right, to ignore these phone calls. Did it specify that it had to provide every single possible option that a person has? Does that? Is that what the amendment adds? The statutory amendment, and there's regulations that flow from the statute, the statute does not require a mortgage servicer to provide a specific, in this case, loan modification or loss mitigation option. What the statute, what the regulations promulgated by the CFPB require from their authority and RESPA is that the information that's provided to the borrowers be accurate and that the borrowers be considered for all available options. So it doesn't, the regulation doesn't go a step further to your question, your honor. They have to be provided X, Y, and Z. So how is that fitting into the statutory language in K-1? Is it standard services duties in K-1C or is it some other phrase? Well, if I may, your honor, can I come back to that question in a moment because there's a second piece to the first question is, since this is a VA loan, we know under the VA statute and we provided the statutory citations in the brief, reply brief for sure, I think in the opening brief, and also I provided lots of circulars in the reply brief, that the VA benefit, and that's why I started out with this, is intended by statute and VA regulations to be for the benefit of the service member. And that's important. So to the question I just had, the VA standard service or duties, which are incorporated into the loan instruments for the CalCut loan and every other VA loan, those would fall under our argument would be 2605 K-1C, standard service or duties. And PRMG admits this in the discovery record. Even CENLAR admitted that they had to follow the VA guidelines. There's no dispute about that fact. Reading the decision from the district court, it's not even addressed. But the evidence that's in the record that we put forward in our motions and response papers was they knew that they had to follow those VA guidelines. We think the CFPB guidelines would fall under C, and also plainly under E, which says failed to comply with any other obligation found by the Consumer Financial Protection Bureau by regulation. So we're trying to think ahead of what do we do after LOPER, but the LOPER decision was pretty clear. If Congress gives regulatory authority to an agency and they exercise that authority, there's no longer a Chevron deference, but that is something much more than just an advisory bulletin. And so we've cited CFPB regulations, but basically the twofold. The other standard service or duties that are not controverted here at all, and I stand before you never having had this situation before with a master servicer, PRMG, and its agent at opposite positions. PRMG, if you read their transcript, and we've outlined the key points, they testify with their corporate designee that a servicer's standard duty is to be honest and fair with its borrowers. I asked about Mr. and Mrs. Calcutt. The response was all borrowers. That was what their standard was. PRMG testified that it was SINLAR, its agent that was responsible for the errors, not PRMG. PRMG routinely said that SINLAR's representatives provided false and inaccurate information to Mr. and Mrs. Calcutt. So just to provide some context on the timeline here, to end their forbearance, Mr. and Mrs. Calcutt had received lots of correspondence. When you're ready to exit your forbearance, contact us. And we are monitoring all available loss mitigation options that are available and are continually. Because in this moment, if you recall back in 2021, the programs were changing. I guess I just want to be clear. What is it that you, where do you find authority under your theory of the case that statutorily they're required to provide this particular kind of information? I guess that's the part I don't understand. We're not arguing that they're required to provide a specific modification. We're arguing that they're required to follow standard duties and they can't provide inaccurate information. That's by regulation from the CFPB. They have to provide all the options available to the service. They have to consider all the options available for the service member. That's both CFPB regs and the VA regs. And they didn't do that in this case. In this case, they told Mr. Calcutt. Which specific reg you're saying that they're supposed to provide? To consider for all available options. If I may, Your Honor, I'll provide that on my rebuttal. Sure. Thank you. It's in the library for sure. But you're all saying this is enforceable because it's swept up by K1C? It's part of K1C, which was enacted as part of the Dodd-Frank. And you have to read K1, or you have to read K, with F. F says... But do you have the statute in front of you, K1C? I do, Your Honor. How does it grammatically work? What does other standard services duties at the end attach to? There's an or in front of it. So what does it line up? The servicer, C, failed to take timely action to respond to the borrower's request to correct errors... Relating to other standard services duties. Correct. So it's just error correction with respect to the duties, not enforcement of the duties themselves. I'm sorry, I missed a... It's correcting errors related to the duties, not enforcing the duties themselves. They must make corrections of the standard servicer duties. Standard servicer duties here provide accurate information, not provide unfair, deceptive lies, misstatements, misrepresentations, which PRMG testified happened routinely to Mr. Ramos' cow cut. And we know that, we know this construction that I'm suggesting to you is true because Congress used the word correct. Correct has a meaning to make right. We provided the dictionary definition in our briefing. I don't believe my friend has provided much response to that. And we know also just textually, looking elsewhere in the statute, which the case law teaches us to do, at 2605F, there's two parts to that that are relevant. Any violation of the section, that's 2605, is privately enforceable under F. However, there's an exception, Your Honor, in F4. If they know of an error, they have an opportunity to cure before any lawsuit's filed. And why is that there? If they had taken a step to correct any of these cascade of errors, telling Mr. Cowcut that he would be eligible for a streamlined modification once he ended, he ends the, they next day, they say, no, you're not eligible for that. We're only giving you this one option. He calls back immediately. They don't take the opportunity to correct the error then. He calls back twice.  It says, failed to take timely action to respond to borrower's request to correct errors. What errors were they trying, what were they responding to the borrower? So the first error is when they were representing in writing that they were monitoring Mr. and Mr. Cowcut had a phone call at the end of May 2021 where that was explained to him on the phone call. We have in the record the transcript. There's no dispute about what was said there. Very precisely. And it was represented by the defendants, the appellees, that, the representative, that they would be eligible for a streamlined modification. And why is that important? It's because Mr. Cowcut wanted to resume making his regular payments and take the forbear payments, the payments that had been subject to the forbearance, and put them on the back end of the loan. Then, within days, then he says, okay, we're ready to exit and restart our plan. Then within days, they send a letter saying, and that's in the record, June 1st, I think it's dated. So it might have been the next day, you're eligible for a different program that will increase your monthly payments by several hundred dollars a month, increase the interest rate on the loan. Something completely different than what he was just told. So the first set of errors is they're saying in writing, hey, we're monitoring, but they really weren't, apparently. And then the next error is he calls them twice. Well, hold on. It says fail to take timely action. I guess my question is, is it, fail to take, isn't the idea that they, you know, Congress didn't want these folks to just have these, you know, borrows out there without any action from the lender and not respond to their questions. I mean, that's what I think it's getting at, isn't it? I mean, it's saying fail to take timely action and to correct this error. That's what it seems to be saying, doesn't it?  But they didn't take any, they didn't correct the misstatement about what type of loan modifications he was eligible for. He makes those phone calls. Then there's a series of letters that he wrote. There's disputes that he wrote to the Consumer Financial Protection Bureau. It's not as if Mr. and Mrs. Calcutt did what some homeowners might do, put their head in the sand and do nothing. They were taking action. They were saying there's these errors and mistakes. What were the defendants doing? They were not correcting the errors. We know what is timely. What were they saying were the errors and mistakes? They provided false information about what loan modifications were available to Mr. and Mrs. Calcutt. And I see that I'm cutting into my time, so I'll answer this question and then save the rest for the follow-up. I'll give you more time because I'm taking you into it. They made phone calls saying, wait a minute, this isn't – just a couple days ago, you told me something different on the telephone, and that's – we have the phone calls, so there's no dispute. PRMG testified those were errors, so there's no dispute about any of these errors. He calls back later in May and sends letters in May. You did a bait-and-switch, basically. You told me I was going to be eligible for one thing, to put the forbeared payments on the end, but you stuck me into another program. Then they're telling him that the putting forbeared payments on certain types of modifications are not even available when the testimony in the record is – and the evidence in the record is they had lots of programs available under the VA program to help the Calcutts to provide exactly what they told them originally they would provide them. And they never took timely effort to cure. And we know what timeliness is from 2605F4 would be at least within 60 days or before suit was filed. When was suit filed here? Long after the OCC found that SINLAR was acting unsafely and unsoundly for these same mortgage service practices. Okay. So, thank you. All right. Thank you, counsel. We'll hear now from Mr. Parsley. May it please the Court, I'm Stephen Parsley here for Applebee's, Paramount, and SINLAR. Mr. Robinson has explained well what forbearance is. I just wanted to briefly talk about two other terms that are at issue in this case, the deferral and the streamlined loan modification. And in a deferral, the payments that were foreborne are moved to the end of the loan, the same maturity date as a balloon payment. And in a streamlined modification, the loan maturity is extended by the same amount of time that the loan was in forbearance. And there's still the same number of payments made over the life of the loan. It's just that there was a pause and an extension. And there's an adjustment of the interest rate, which was something that the CalCuts were unhappy about. The adjustment of the interest rate is part of the streamline? Is that in the transcript of this phone call? I think it's in one of the phone calls. There are several. We have two or three of the phone calls, and it's explained in one of them, for sure, Your Honor. Let me get now to the issues, the specific arguments we have here. So there's the RESPA theory for being denied a deferral. To be clear, as we explain in our briefing, RESPA says very little about loan modifications. There's a requirement that servicers have to make reasonable diligence to obtain the information they need to review a loss mitigation application, but that's not the argument here. There's an error correction requirement that Mr. Robinson and the CalCuts mainly focus on, but the standard servicers' duties catch-all phrase can't be stretched so far as they would like to cover not receiving a specific sort of loan modification or deferral. And that comes very clearly from this Court's Medrano decision, and although Medrano, as the CalCuts have pointed out, was dealing with pre-Dodd-Frank law, there have been cases since then, more recent ones, from sister circuits that have held to the same conclusion on the issue of servicing and loan modification, that the two are not the same. Servicing does not cover loan modifications because those are contractual issues. And contrarily, there's been no authority in the 12-ish, 13 years or so since Dodd-Frank and RESPA Reg-Ex regulations were issued that would support the idea that there's a private right of action for not obtaining a deferral. Dodd-Frank did not change that, and finally, we would note that Regulation X disclaims any duty on a servicer to provide a borrower with a specific loss mitigation application. That shows that the CFPB has thought about this. They've thought about whether there's something in RESPA that would allow a private right of action for not receiving a specific loan mod that a borrower would desire, and decided not to implement that. And this Court should not become the first to follow that theory. So even if they had a legal leg to stand on, they don't have a factual leg to stand on. Factually, SINLAR never promised a deferral. We have all those calls in the records. We have the mailings in the records. And SINLAR consistently told them that they were getting a streamlined loan modification. Now, as I talked about with the definitions, in both a deferral and a streamlined modification, in a sense, the foreborn payments are moved to the end. So there could have been some ambiguity in those calls that Mr. Calcutt led him to think it was a deferral when it was a streamlined modification. But there's also records in the call where he was told that he was not going to get a deferral for this loan. Tellingly, SINLAR didn't begin implementing any deferral or a comparable option for VA loans until after they got their loan modification. And both of the sorts of programs that they describe, the Calcutts describe, the COVID VAPCP and the September 2020 VA Circular, were expressly made optional for lenders and servicers to apply. So we end up with a strange situation where we're being told that a standard servicer's duty is to offer a program that was made optional. And I don't think we can get past that conundrum. We haven't said much about the credit reporting errors, but that's their alternate theory under RESPA. Once again, RESPA can't be stretched. The standard servicer's duty catch-all cannot go to cover erroneous credit reporting and provide a private right of action for that. RESPA only says a little bit about the credit reporting error. The CARES Act says a little bit about that, too, but most of where Congress has dealt with credit reporting errors is in the Fair Credit Reporting Act. What Congress chose to do there is to have a dispute investigate correct three-step requirement. It's not a strict liability statute where as soon as an erroneous credit report is made by a furnisher, the borrower can immediately sue. But the agency has to, sorry, the servicer has to have the opportunity to investigate and correct. And that's what the record shows SINLAR did here. Within just a few weeks after being told that they had erroneously reported Mr. Calcutt as delinquent while he was in his CARES Act forbearance, SINLAR reached out to all three of the credit bureaus. And the credit bureaus did correct that right about the time when he was beginning his streamlined load modification. So, we've moved now to some of the factual defects with their credit reporting theory. But the core problem here is there's no injury or damages caused by the credit reporting error. And that's because when they entered into their streamlined loan modification, they had to have a six-payment seasoning period before they could refinance. And they've complained about not getting the refinancing, which they ultimately were able to pretty soon after the streamlined loan modification had six payments made under it. But both of the refinancing denials we have in the record were in the fall of 2021. And one of them explicitly says that the borrower does not meet the seasoning requirement, must make six payments after loan mod. So, that leaves no doubt that it was the seasoning requirement that led to those denials, not the credit reporting errors. And the other lender that denied refinancing said application incomplete and said nothing about the credit issues. The CalCuts have not identified any contrary evidence to suggest that the credit reports had any causal role in those refinancing denials. And to be clear, the last of the three credit bureaus to clear the errors had done so by October of 2021. If there are no questions about the RESPA claim, I can move now to the Consumer Fraud Act. Under that, the CalCuts have sought only a certification of a question of law. Did they request that below? They did not request that below, Your Honor. It was made for the first time on appeal. And this court has an especially high bar on that. It's not exactly waiver, but there's similar principles of judicial economy at stake if a certification is sought for the first time on appeal. Additionally— Arizona, unlike California, does allow district courts to certify. Yes, Your Honor, it does. The Villegas decision that they make most of their argument on has no applicability because it concerned a new loan and not a loan mod. And that makes sense that you would consider a new credit transaction to be a sale. There's money exchanging hands and then a repayment obligation. On the other hand, when there's a loan modification, there's no new funds going out. There's merely a change to the terms of repayment. And the Arizona District Court has sort of struggled at this over the years but arrived at the right conclusion within the past decade that Villegas is not covering loan modifications. What's the status of the decisions among the district court judges in the District of Arizona? Are they divided on this question? That's a great question. About the coverage of modifications? I'm not sure whether there's a judge-by-judge split on it or if it's just a recent CSU. I'd have to check, Your Honor. Okay. I mean, because if there's still—if recent decisions are divided, that looks different than if there's one aberrant decision 20 years ago that no one's followed. Yes, Your Honor. But we'd also note that even if they had sort of a cognizable claim for loan modifications under the ACFA, they would still need to meet the factual predicate of there being a misrepresentation that's part of the statute. And for similar reasons under RESPA facts, as we pointed out, that there's no misrepresentation that SINLAR made in connection with the loan modification. So even if this court certified the question they asked and even if the Arizona Supreme Court came back and said, yes, a loan mod could count, it would be giving an advisory opinion. They couldn't still sustain that claim on this. And— So it wouldn't be dispositive of the claim?  Okay. Correct. This court can affirm simply on the fact that there was no misrepresentation made, even if it doesn't want to reach that question of whether the statute can sweep up a loan modification. I think the question is, if the Arizona Supreme Court was to issue a decision, we'd still have to figure out if there was a misrepresentation made. But the Arizona Supreme Court's decision would not be dispositive because they have another factor that would have to be— Yes. Correct, Your Honor. Well, that's all I have, unless you have any questions, Your Honor. All right. All right. Thank you, counsel. You put two minutes on the clock for rebuttal. Mr. In answer to the regulation, there's— in the reply brief are several VA regulations and circulars that are there as to the purpose of the VA program is to— loss mitigation is for the benefit of the service member. In the CFPB regs, it's 1038, and we list those out, I think, in one of the briefs. But they list the affirmative duties for the servicer. Provide accurate information. Provide all available information. Doesn't say provide a particular loan mod. But here they didn't— they told Mr. and Mrs.—Mr. Calcutt, streamline, and that's in the record, at E—or 5ER-835-36, 6ER-984-86-992, that the payments would be put on the end of the loan. They called it a streamline in that call. But they never evaluated them for the streamline. That's at 3ER-426-56. My friend is correct that over time, they got misinformation about a streamline later, in July, but this was in June when they came out of forbearance, and they were told they could get the streamline modification. So there are—I would just encourage the court, in its capacity, to go through the errors that we've summarized. They had this bait-and-switch on the modification coming out of forbearance. Then they offered a disaster modification that didn't do what they said expressly on the phone they weren't going to do. They promised not to report the Calcutts late to the credit bureaus, but they did. They admitted that in their answer. That's a violation of the CARES Act. They were not, as a standard service or duty under the CARES Act, permitted to report late. My friend is a little incorrect on this—on the seasoning. The seasoning denial had to do because they were reported late. They couldn't redo or refinance—they were trying to get away from the defendants and refinance because of the late reporting that had not seasoned off the report for six months. So I encourage the court to look at the record, especially Volume 5, and reverse the judgment below. We think, at a minimum, there's a dispute of material fact with the errors that PRMG admitted to, and they're pretty plain on their face. Thank you very much for your time today. All right. Thank you, counsel. The case just argued is submitted, and that completes our calendar for this week, and we are adjourned.
judges: COLLINS, VANDYKE, MENDOZA